1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    EASTERN DISTRICT OF WASHINGTON

7    ASOPURU OKEMGBO,

                                        NO:  12-CV-5119-TOR
8                        Plaintiff,

                                        ORDER GRANTING DEFENDANT'S
9          v.                           MOTION FOR SUMMARY
                                        JUDGMENT
10   WASHINGTON STATE
     DEPARTMENT OF ECOLOGY,

11
                         Defendant.
12

13        BEFORE THE COURT is Defendant's Motion for Summary Judgment

14   (ECF No. 24) and Plaintiff's untimely Motion for Summary Judgment (ECF No.

15   50).[1] This matter was submitted for consideration without oral argument.  The

16   Court has reviewed the briefing and the record and files herein, and is fully

17   informed.

18   ///

     _____

19   [1]  Plaintiff, appearing *pro se*, filed a motion for summary judgment (ECF No. 50)

20   on January 17, 2014, 39 days after the deadline for dispositive motions.


ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 1

BACKGROUND

*Pro se* Plaintiff Asopuru Okembgo, Ph.D., ("Plaintiff" or "Dr. Okembgo") alleges that Defendant violated his civil rights under Title VII of the Civil Rights Act by wrongfully terminating him on the basis of race, national origin, and religion.  Defendant Washington State Department of Ecology ("Department") now moves for summary judgment on grounds that Plaintiff fails to establish a prima facie case of discrimination; the Department had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment; and Plaintiff fails to show the Department's proffered reason for terminating him was pretext for discrimination. For the reasons explained below, the Court grants Defendant's motion.

FACTS[2]

Plaintiff Asopuru Okembgo, Ph.D., ("Plaintiff" or "Dr. Okembgo") is a chemist; president of a nonprofit corporation named Skills Development Mission headquartered in Kennewick; and author of a book titled "Pop the Question, Get Yes, Get Married," a book concerning Christianity and marriage advice. Defendant

---

[2]  The facts are excerpted from the parties' statements of fact and supporting exhibits and are accepted as true, with noted exceptions, for the purposes of the instant motion.

Washington State Department of Ecology ("Department") hired Plaintiff as a Chemist 3 in February 2008. ECF No. 25 at 1. Einar ("Ron") Skinnarland ("Skinnarland"), Waste Treatment Section Manager, was on the hiring committee and became Plaintiff's direct supervisor.[3] *Id*. at 1, 3.

After Dr. Okembgo's probation period had ended, three of Dr. Okembgo's co-workers, N.S., T.W., and A.C., alleged that Dr. Okembgo had engaged in inappropriate touching and/or conversation with them.[4] ECF No. 25 at 2; Skinnarland Declaration at 3. As a result, on June 11, 2009, Skinnarland contacted his supervisor, and Human Resources investigated the allegations. ECF No. 25 at 10-11; Skinnarland Declaration at 3; Declaration of Polly Zehm at 2; Declaration of Wendy Holton at 2. The investigation focused on alleged violations of Department sexual harassment and use of state resources policies. Holton Declaration at 2. During the investigation, 25 people were interviewed, and "captures" of Dr. Okembgo's computer and internet use were examined.

---

[3] Dr. Okembgo states that Skinnarland did not want to hire him, preferring a family friend, Dr. Eberlein—a claim that Defendant disputes. *See* ECF No. 45 at 2.

[4] The Court considers the details of these and future allegations of inappropriate behavior in greater detail below.

On December 7, 2009, Polly Zehm, Deputy Director of the Department, sent Dr. Okembgo a predisciplinary notice indicating that the Department was considering taking disciplinary action against him and citing allegations of inappropriate touching and conversations with female employees and inappropriate use of state resources. ECF No. 25 at 12; Zehm Declaration at 2. After a meeting with Dr. Okembgo and Department and Union representatives, Zehm sent Dr. Okembgo a notice suspending him without pay from March 9, 2010, through March 29, 2010.[5]

Dr. Okembgo's supervisor Skinnarland met with Dr. Okembgo before and after his suspension, memorializing each of their discussions in writing in memoranda entitled "Work Expectations." ECF No. 25 at 13. The resulting memoranda indicate that Dr. Okembgo was prohibited from using work time to promote, sell, or distribute his book on marriage, and from using work time to counsel co-workers or offer to pray with them. *Id*.

After Dr. Okembgo's suspension and meetings with Skinnarland, the Department hired S.N., who became seated in a cubicle close to Dr. Okembgo. ECF No. 25 at 14; S.N. Declaration at 2. S.N. also reported a series of

---

[5] Defendant states that although the collective bargaining agreement allowed Dr. Okembgo to grieve the decision, he did not file a grievance. ECF No. 25 at 13

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 4

uncomfortable interactions with Dr. Okembgo, which were reported to Human Resources. ECF No. 25 at 18-19.

After receiving report of the new allegations against Dr. Okembgo, Human Resources began another investigation focusing on the alleged violations of the Department's sexual harassment policy, but more expansive, to include an inquiry into whether Dr. Okembgo distributed his book on marriage and made offers of counseling and prayer. *Id.* at 19. On March 22, 2011, Dr. Okembgo was sent another pre-disciplinary notice informing him that the Department was considering disciplinary action which included allegations of inappropriate behavior of a sexual nature toward a female co-worker and failure to follow a supervisor's directive. *Id.* at 20. Dr. Okembgo and Department and Union representatives attended his pre-disciplinary meeting on April 1, 2011. On April 15, 2011, Human Resources sent Dr. Okembgo a notice of dismissal informing him that he was terminated from employment effective that day. ECF No. 25 at 20.

**A. The Sexual Harassment Allegations**

Dr. Okembgo disputes many of his four co-workers' substantive allegations; however, he does not appear to dispute the fact that they made the allegations to the Department. Each co-worker's allegations are as follows:

///

///

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 5

1. <u>N.S.</u>[6]

According to the Fact-Finding Inquiry Form summary resulting from Human Resources' investigation, N.S.'s allegations against Dr. Okembgo included the following:

- Unwanted hugging
- Bringing her Bible verses
- Coming into N.S.'s cubicle and standing very close to her
- Patting her on the shoulder sliding his hand down to just above her elbow, and pinching her—an action repeated three times

ECF No. 29-1, Exhibit D.

2. <u>T.W.</u>

According to the Fact-Finding Inquiry Form summary resulting from Human Resources' investigation, T.W.' allegations against Dr. Okembgo included the following:

- Unwanted back rubs in her cubicle—a "couple"
- "Forced" hugging, in which Dr. Okembgo would grab her elbows and pull her to him for a hug—an estimated ten occasions
- "Pulling" her into a conference room to pray after she told him about a miscarriage

ECF No. 30, Exhibit E.

3. <u>A.C.</u>

According to the Fact-Finding Inquiry Form summary resulting from Human Resources' investigation, A.C.'s allegations against Dr. Okembgo included the

---

[6] The Court uses initials here to protect the privacy of the women involved.

following:

- Commenting on A.C.'s coat, which was hanging outside her cubicle. When she stated that it had stains from her young child's food, he said that some stains have value, mentioning "Monica Lewinsky," and her "blue dress."
- After lunch with Mr. Okembgo, he told A.C. "Tell your husband not to worry. I won't take you away from him.

ECF No. 28, Exhibit C.

    4. <u>S.N.</u>

According to the Fact-Finding Inquiry Form summary resulting from Human Resources' investigation and her declaration, S.N.'s allegations against Dr. Okembgo included the following:

- Giving S.N. his book on marriage, which includes discussion about ovulation.
- Asking personal questions about female reproduction.
- Asking when her body temperature changed and stating that he could sense when his wife's temperature changed.
- Asking if she was "early in her cycle," if she "knew how to tell," and if she had "a regular 28-day cycle."
- Stating in a conversation about getting pregnant, "You have to hold on until you get a full deposit."
- Standing close to her after she told him to clean his desk and stating "what will be my reward for cleaning my desk?"
- Repeatedly whispering her name from his cubicle.
- Telling S.N. that she should try to get pregnant over the weekend.
- Telling her he would pray for her over the weekend and making a gesture similar to holding a baby.
- Keeping a piece of candy S.N. had given him in a heart-shaped box and telling S.N. that it was special to him and he was keeping it in his heart.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 7

- Stating that he could not look on the floor for a piece of candy S.N. had dropped because people would think he was looking between her legs.
- Suggesting that S.N. bring her husband's elastic exercise band to work because he could show her things her husband and she could do together with it.

Declaration of S.N., ECF No. 27; ECF Nos. 27-1 and 27-2, Exhibits A and B.

### B. Other Allegations

The Department also claims that Dr. Okembgo misused state resources by using his email for personal emails and viewing large numbers of non-work-related internet sites. Though Plaintiff disputes at least some of these allegations, Human Resources Consultant Wendy Holton declared that a "capture" of Plaintiff's computer and internet use indicated that between April 28, 2009, and June 1, 2009, Dr. Okembgo had accessed 1,416 non-work-related websites. Holton Declaration, ECF No. 33. She also stated that between February 15, 2009 and July 1, 2009, he had sent or received 155 non-work-related emails, 44 of which appeared to be related to Dr. Okembgo's non-profit organization. *Id.*

Skinnarland also claims that Dr. Okembgo appeared to be spending time at the Washington State University library (a place where employees sometimes went for legitimate reasons) to work with students on his nonprofit corporation during work hours. ECF No. 32-4, Exhibit M. Skinnarland reported seeing Dr. Okembgo

come in late from lunch, take personal calls, and leave meetings to take personal

calls. *Id*.

## C. The Work Expectations Memoranda

The Work Expectations memoranda provide, *inter alia,* the following

supervisory directives:

> 4) You are not to use your work time for any non-work activity, including:
> - Promoting and soliciting contributions of money, time or other donations for your non-profit organization or other non-work related activities that you are involved in
> - Promoting, selling and/or distributing your book on marriage
> - Promoting religious opinions, providing religious information, counseling, offers to pray
>
> 5) You are not to use your assigned state computer, work phone, copy machine, fax machine or any other state equipment for any non-work related activity.

ECF No. 32-5, Exhibit N. The other Work Expectation memorandum has

substantially the same provisions. ECF No. 32-6, Exhibit O.

## D. Procedural Background

Through his union, Dr. Okembgo filed a grievance challenging his

discharge. ECF No. 25 at 21. An arbitration hearing was held on that issue and to

determine whether the Department violated the collective bargaining agreement

when it provided documents only to the union and not to Dr. Okembgo. *Id*. The

arbitrator determined that the Department and the Union agreed to a variance in the

collective bargaining agreement where in the Department only provided documents

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 9

to the union and not to Dr. Okembgo. *Id*.   The arbitrator also determined that the

Department had just cause to dismiss Dr. Okembgo. *Id*. Dr. Okembgo maintains

that the Department failed to follow its own internal policies or the collective

bargaining agreement with the Union.

On September 10, 2012, Dr. Okembgo filed the action now before the Court,

alleging that the Department engaged in unlawful employment practices in

violation of Title VII of the Civil Rights Act by

> subjecting [him] to disparate terms and conditions of employment
> (allegations of sexual harassment, failing to follow due process during the
> disciplinary hearing, issued management directive that violated my freedom
> of speech rights; and supporting Ronald Skinnarland's, Section Manager,
> efforts of intimidation, hostile work environment, wrote that I was predatory
> toward women, undermining my standing at workplace), and by wrongly
> terminating my employment on the basis of my Black/African/Nigerian/
> Christian, race, national origin and religion.

ECF No. 1.

## DISCUSSION

**A. Legal Standard**

Summary judgment may be granted to a moving party who demonstrates

"that there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

bears the initial burden of demonstrating the absence of any genuine issues of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* In ruling upon a summary judgment motion, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only evidence which would be admissible at trial may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

**B. Plaintiff's Discrimination Claims**

Plaintiff contends that he was discharged from his position as chemist because of his race, national origin, and religion. Defendant argues that Plaintiff's claim fails because he does not establish a prima facie case of discrimination; the Department of Ecology had a legitimate, non-discriminatory reason for terminating Plaintiff; and Plaintiff fails to show that the Department's proffered legitimate, non-discriminatory reasons were merely pretext for discriminatory motives.

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

> It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion…or national origin….

42 U.S.C. § 2000e–2(a). Title VII claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1105 (9th Cir. 2008). Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie discrimination case. *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123 (9th Cir. 2000). If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.* at 1124. If the employer does so, then the plaintiff must show that the employer's proffered reason is merely pretext for a discriminatory motive. *Llamas v. Butte Cmty. Coll. Dist.,* 238 F.3d 1123, 1126 (9th Cir. 2001).

The Court notes that Plaintiff does not appear to allege that the Department failed to accommodate his religious beliefs in violation of § 701(j) of Title VII.  To establish a prima facie case of discrimination under that theory, the plaintiff must prove the following: 1) he had a bona fide religious belief, the practice of which

conflicts with an employment duty; 2) he informed his employer of the belief and

conflict; and 3) the employer discharged him because of his inability to fulfill the

job requirement. *Peterson v. Hewlett–Packard Co.,* 358 F.3d 599, 606 (9th Cir.

2004); *Berry v. Department of Social Services,* 447 F.3d 642, 655 (9th Cir. 2006).

Here, there is no suggestion that Plaintiff's behavior stemmed from a bona fide

religious belief, that he informed his employer of this belief, or that he was

discharged because he was unable to fulfil the job requirement. Accordingly, the

Court analyzes Plaintiff's claims as disparate treatment claims under Title VII.

### 1.  Whether Plaintiff Established a Prima Facie Case for Discrimination

To make a prima facie case for discrimination under Title VII, Plaintiff must

offer evidence that "'give[s] rise to an inference of unlawful discrimination,' either

through the framework set forth in *McDonnell Douglas Corp. v. Green* or with

direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cnty. of Los*

*Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (quoting *Cordova v. State Farm Ins.*

*Companies,* 124 F.3d 1145, 1148 (9th Cir. 1997)). In the absence of direct

evidence, under the *McDonnell Douglas* framework, Dr. Okembgo has the burden

of showing that (1) he is a member of a protected class; (2) he was qualified for his

position; (3) he experienced an adverse employment action; and (4) similarly

situated individuals outside his protected class were treated more favorably, or

other circumstances surrounding the adverse employment action give rise to an

inference of discrimination. *Peterson v. Hewlett-Packard Co.,* 358 F.3d 599, 603 (9th Cir. 2004) (citing *Chuang v. University of Cal. Davis Bd. of Trs.,* 225 F.3d 1115, 1123 (9th Cir. 2000); *Lyons v. England,* 307 F.3d 1092, 1112-14 (9th Cir. 2002). This showing is minimal and need not even rise to the level of a preponderance of the evidence. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994). But it must be more than "purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars." *Peterson*, 358 F.3d at 603 (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1419 (9th Cir. 1988)).

A plaintiff can also establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test if he provides evidence suggesting that the "'employment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act.'" *Cordova*, 124 F.3d at 1148-49 (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 (1977)) (finding in lawsuit by a Mexican-American job candidate evidence of discriminatory animus where hiring manager referred to another Hispanic employee as a "dumb Mexican" and declared that he was hired because he was a minority). Such derogatory comments can create an inference of discriminatory motive. *Id. See also Warren v. City of Carlsbad,* 58 F.3d 439, 443 (9th Cir. 1995) (fire chief's derogatory comments about Hispanics create inference of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 14

discriminatory motive); *Lindahl v. Air France,* 930 F.2d 1434, 1439 (9th Cir. 1991) (supervisor's remarks indicating sexual stereotyping create inference of discriminatory motive); and *Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1128 (finding direct evidence of discriminatory motive where state university official stated that "two Chinks" in the pharmacology department were "more than enough" and the dean laughed in response).

Here, Plaintiff appears to allege direct discriminatory animus. First, he indicates that Mr. Skinnarland and Ms. Singleton requested his dismissal based on Plaintiff's religious beliefs. *See* ECF No. 45 at 59 ("Both Mr. Skinnarland and his 'work wife' Ms. Singleton cleared [sic] requested for dismissal of the plaintiff based on the plaintiff's religious beliefs. As was outline[d] on discussion of material facts paragraphs 76 and 77.[7] Their statements were very clear and need no further discussion."). Dr. Okembgo's statement of facts includes these allegations:

> It is fact Mr. Skinnarland pushed his discriminatory agenda when he wrote Ms. Polly Zehm an email (Exhibit 19) recommending dismissal of Dr. Okembgo based on religion. In Mr. Skinnarland's email of 3/24/2011, he wrote:

---

[7] This appears to be a mistake. Paragraphs 76 and 77 of Plaintiff's statement of facts excerpt a declaration of Kevin Leary, a Department of Energy Project Manager for one of Dr. Okembgo's projects. The excerpts concern Dr. Okembgo's professional qualifications and work demeanor. ECF No. 45 at 36.

"I believe the recurrence of the inappropriate behavior for which Asopuru has been previously disciplined in March 2010, and the continued liability to Ecology that he poses if he is returned to our work place is sufficient reason to justify his termination.

[Dr. Okembgo]
      i. Continues to be a major liability for the state for inappropriate behavior, both inside our office and in his interactions with the Department of Ecology and its contractors in his work as a regulator. This [] risk is demonstrated by Asopuru's behavior with S.N., which started only a few months after he was suspended without pay for his previous inappropriate behavior. '
      ii. [sic] Continues to promote his non-profit and his book despite disciplinary action and repeated written direction not to do so.
      iii. Continues to promote religious opinions and provide unsolicited and unwelcome counseling to NWP staff and to people on the Hanford site who NWP regulates.
…

Mr. Skinnarland further send [sic] another email originated by Ms. Deborah Singleton (Exhibit 20) on 3/28/2011 to Ms. Polly Zehm insisting that Dr. Okembgo should be dismissed on the bases of his religious opinion as follows:

"Asopuru sincerely believes that because of his religious beliefs, his advice is warranted and useful; regardless of whether it is requested or not.

I do not believe that his continued employment will offer much assistance to me in completing the tasks and assignments charged to him. His inability to meet deadlines and work within a team are evidence of the challenges that lay ahead. His continued communication of his religious beliefs and opinions to unsuspected staff could proof [sic] to be detrimental to the retention of good employees."

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 16

Plaintiff's Statement of Facts, ECF No. 45 at 33-35, paras. 74-75 (emphasis in Plaintiff's quotation).

Though not a strong argument for discrimination, Plaintiff's dispute of the facts, taken in the light most favorable to him, are sufficient to preclude summary judgment on Plaintiff's failure to make a prima facie case.

Additionally, under the *McDonnell Douglas* scheme, the Court notes that there is at least a dispute of material fact as to whether individuals outside of Plaintiff's protected class were treated more favorably. For example, Dr. Okembgo states that pink Post-It Note hearts were placed around his cubicle, constituting sexual harassment which was never investigated by Defendant. He appears to claim that the alleged sexual harassment he received (evidenced by the pink Post-Its) went uninvestigated by Human Resources, while Human Resources *over*investigated the allegations against him. *See* ECF No. 45 at 54 ("Mr. Skinnarland took it upon himself to contact female employees coercing them to bring sexual harassment allegations against the plaintiff."), and ECF No. 45 at 57 ("The Plaintiff brought the attention of Management and the Union to the fact that there was unwelcome posting of pink hearts in plaintiff's cubicle…. This was particularly a harassment since the person who posted them did not identify himself/herself. Management did not carry out any investigation.").

1          Plaintiff also argues that the Department's hiring of Dr. Elis Eberlein is

2   evidence of disparate treatment. The Court disagrees. Plaintiff sets forth in his

3   responsive statement of facts that, at the time Plaintiff was hired, Mr. Skinnarland

4   had wanted to hire another candidate, Dr. Eberlein. Plaintiff states that "Mr.

5   Skinnarland created a Chemist 3 position for Dr. Eberlein, a Microbiologist. He

6   was hired for that position." ECF No. 45 at 2. Plaintiff provides no evidence or

7   supporting declaration for this statement, which appears in his response to

8   Defendant's motion for summary judgment. In reply, Defendant points out that the

9   Department of Ecology hired Dr. Eberlein as a permanent chemist on July 1, 2009.

10  ECF No. 54 at 4, citing Skinnarland Declaration at 2:20-22. Dr. Eberlein's hiring

11  therefore took place more than nine months before Plaintiff's discharge. Thus,

12  there is no indication that Dr. Okembgo was terminated so that Dr. Eberlein could

13  have his job, or that Dr. Eberlein was treated differently than Dr. Okembgo with

14  respect to hiring decisions.

15         Proceeding under the facts viewed in a light most favorable to Plaintiff, the

16  Court assumes that Plaintiff has made out his prima facie case of discrimination.

17  Accordingly, the Court next considers whether the Defendant established

18  nondiscriminatory reasons for discharging Dr. Okembgo.

19  ///

20  ///

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 18

## 2. Whether Defendant Established Nondiscriminatory Reasons for the Challenged Action

If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Chuang,* 225 F.3d at 1124. Here, through the introduction of admissible evidence, the Department can articulate legitimate, non-discriminatory reasons for having discharged Dr. Okembgo. In fact, the record is rife with compelling, non-discriminatory reasons for discharging Plaintiff, particularly the repeated allegations of sexual harassment by Dr. Okembgo. Defendant also cites Dr. Okembgo's alleged misuse of state resources.

### a. Allegations of Sexual Harassment

The Department's sexual harassment policy makes clear that the Department "Does Not Tolerate Any Kind of Sexual Harassment in the Workplace." Dep't of Ecology, Chapter 1: Executive Policy and Procedure, ECF No. 33-3, Exhibit S. Furthermore, this prohibition extends to all employees, not just supervisors:

> All Ecology employees must foster and maintain a work environment free from any kind of sexual harassment and inappropriate behavior of a sexual nature. Any employee who is found to be in violation of this policy may be subject to disciplinary action, up to and including dismissal.

*Id*. The policy defines "inappropriate behavior of a sexual nature" as including

"written, graphic or verbal communication, including demeaning or offensive comments, gossip, epithets, suggestions, jokes, slurs, or negative stereotyping based on gender"; and "physical behavior such as unwelcome touching, standing too close, cornering, leaning over, or repeated brushing against a person's body." *Id*.

The undisputed evidence shows that the Department received multiple complaints about Dr. Okembgo's behavior in violation of the sexual harassment policy. Dr. Okembgo was reported for repeated instances of physical invasions of his female co-workers' space. For example, two co-workers reported "unwelcome touching," including unwanted hugs and back rubs. *See* Declaration of T.W., ECF No. 30; Declaration of N.S., ECF No. 29. T.W. reported that Dr. Okembgo pinched the back of her arm three times. T.W. Declaration, ECF No. 30. Three women reported that he would stand close to them in their cubicles. Dr. Okembgo was also reported for inappropriate statements that made his female co-workers uncomfortable. For example, A.C. reported his statements likening the food stains on her coat to the infamous stains on Monica Lewinsky's blue dress, and telling her to tell her husband not to worry because he would not "take [her] away from him." A.C. Declaration, ECF No. 28 at 2. S.N. reported his repeated comments about her fertility and possible pregnancy, including asking about her "cycle," telling her to "hold on until you get a full deposit," and telling her she should try to

get pregnant over the weekend. S.N. Declaration, ECF No. 27. These occurrences

and statements fall squarely into "inappropriate behavior of a sexual nature"

prohibited under the sexual harassment policy, including "verbal

communication… offensive comments, … suggestions" and "physical behavior

such as unwelcome touching, standing too close, cornering, leaning over, or

repeated brushing against a person's body." There is no suggestion that such a

prohibition on sexual harassment violates Mr. Okembgo's rights; in fact,

discrimination based on sex, as can be evidenced by serious sexual harassment, is

one of the types of discrimination against which Title VII protects. *See Meritor*

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

Plaintiff makes mostly conclusory denials that these events occurred. But

what is undisputed is that these co-workers made the reports in question. Thus,

their reports give the Department ample cause to discharge Plaintiff, regardless of

Dr. Okembgo's dispute of the reports' accuracy.  As Skinnarland stated, in a line

cited by Plaintiff, "the continued liability to Ecology that he poses if he is returned

to our work place is sufficient reason to justify his termination." ECF No. 45 at 34.

### b.  Allegations of Misuse of State Resources

Under the Department's policy, the private use of state resources is "Strictly

Prohibited" in certain circumstances, including "[a] use for the purpose of

supporting, promoting, or soliciting for an outside organization or group unless

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 21

provided for by law or authorized by an agency head or designee," or "[c]ommercial uses such as advertising or selling." Dep't of Ecology, Chapter 1: Executive Policy and Procedure, ECF No 32-2, Exhibit R. These activities are not subject to the Department's *de minimus* use exception to the general prohibition on private use of state resources. *See id.*

Plaintiff contends that the 44 emails about his nonprofit organization should fall into the policy's exception for nonprofit work. ECF No. 45 at 29. That exception states that "employees may participate in fund-raising activities in a state-owned or leased facility subject to the following conditions," including that "the activity is authorized by the Director." ECF No. 33-2, Exhibit R. There is no suggestion that Plaintiff had authorization from the Department in any way to use state resources for work on his nonprofit organization. Thus, their inclusion as one of the reasons the Department cited for terminating Mr. Okembgo appears legitimate.

Plaintiff disputes much of Human Resources' findings with respect to the Department's claims that he misused state resources. For example, Plaintiff disputes that he visited 2,270 websites within 47 days, as Defendant alleges, and that all of the non-work related sites were in fact not related to work. ECF No. 45 at 27-28. But this alone does not defeat summary judgment on this issue. He acknowledges sending at least some non-work emails. These allegations compound

1  generally with the inappropriate behavior to his female-coworkers. Even viewed in

2  the light most favorable to Plaintiff, it is evident that he was discharged, not

3  because of his religious beliefs or race or national origin, but because he violated

4  the Department's sexual harassment and misuse of state resources policies, and

5  because he did so repeatedly, after warnings and discipline. Defendants have

6  consequently rebutted the presumption arising from Plaintiff's prima facie case,

7  and the burden returns to Plaintiff to show that his former employer's proffered

8  reasons for termination were merely pretext for an underlying discriminatory

9  motive.

### 3.  Whether Employer's Proffered Reasons Were Merely Pretext for Discriminatory Motive

To prevail on his employment discrimination claim, Plaintiff must show that Defendant's proffered legitimate, non-discriminatory reasons for discharging him were pretext for discriminatory animus.  Plaintiff makes several arguments that the Department's proffered reasons for termination were pretexual.

First, he states that "sexual harassment allegations were used as a ploy to discriminate against the Plaintiff. Mr. Skinnarland set the stage, was the drum beater, and got what he wanted—to dismiss the plaintiff since he had positioned his family friend as his new chemist in his Section." ECF No. 45 at 58. Plaintiff explains:

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 23

The defendant policy 1-32 on sexual harassment was not followed in investigating and dismissing the plaintiff from his appointment. The policy against sexual harassment was clear on what sexual harassment is supposed to be. There was no place in which it stated that management should snooze [sic] around asking whether employees felt comfortable around/about another employee. However Mr. Skinnarland took it upon himself to contact female employees coercing them to bring sexual harassment allegations against the plaintiff.

ECF No. 45 at 54. This conclusory denial of the legitimacy of the claims and further conclusory statement that Skinnarland "coerced" the women who alleged his misconduct are insufficient to create genuine issue of material fact as to pretext. The evidence shows no indication of coercion or trumping up complaints against Dr. Okembgo. Dr. Okembgo points to the fact that several of the women were reluctant to report him. *See* ECF No. 45 at 39, citing S.N.' statement to Skinnarland, Defendant's Exhibit A. For example, he states that "[S.N.] was pressured by Mr. Skinnarland to write a report and she reluctantly submitted an information letter sent to Mr. Skinnerland and the HR." *Id.* But S.N.'s statement does not speak to her reluctance; rather she stated that she felt it was "important" to make the Department of Ecology aware of these events." ECF No. 27-1, Exhibit A.

Plaintiff additionally makes a conclusory statement suggesting that S.N.'s report was coerced. ECF No. 45 at 55 ("Why was [S.N.] coerced into writing a report that she was unwilling to do?"). But he offers no evidence that she was in fact coerced or unwilling to write the report, other than suggesting that fear of her

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 24

superiors "might have been a possibility." *Id*. However, such speculation is insufficient to throw S.N.'s entire report into dispute. He also mentions that after S.N. told him that she did not want to talk about morning sickness, he did not pursue the conversation. *Id*. But he fails to mention the other eight allegations of inappropriate behavior listed in her report. *See* ECF No. 27-1, Exhibit A.

Similarly, Dr. Okembgo cites another reference to T.W.'s reluctance to report him. Again, however, the interview notes cited do not indicate coercion or even real reluctance to report. *See* ECF No. 45, Plaintiff's Exhibit 8 ("Initially, [T.W.] did not want to be involved in a confrontation with management there and Asopuru, she was uncomfortable with the idea. Later on, after additional incidences in the hall, she changed her mind and we met…"). Reluctance to be involved with an official investigation cannot be equated to reluctance to make a report or coercion. T.W. in fact "changed her mind" after additional inappropriate incidents.

Dr. Okembgo additionally cites a number of declarations of other Department employees, stating that they had never had a problem with him or noticed the alleged behavior. But the Court notes that evidence that Plaintiff did not have problems with *some* co-workers is not evidence that Plaintiff did not have problems with the co-workers who made allegations of inappropriate behavior.

1    Nor is it relevant that Dr. Okembgo is not the supervisor of the women

2    alleging the inappropriate behavior, as Dr. Okembgo argues. *See* ECF No. 45 at 54

3    ("Taken individually, [N.S.'s], [T.W.'s], and [S.N.'s] allegation of sexual

4    harassment does not stand the test of the plaintiff being their superior at work or

5    having authority to make any decisions in the work place. They, therefore, do not

6    have any basis of being afraid of telling the plaintiff that they were uncomfortable

7    with him or around him."). The behavior the women reported violated the

8    Department's sexual harassment policy, regardless of the relative status of the

9    individuals involved.

10    In short, Dr. Okembgo appears to have believed that Skinnarland had it out

11    for him, that Skinnarland went around the office asking women if they had a

12    problem with Dr. Okembgo, and that Skinnarland coerced women into making

13    untrue statements about Dr. Okembgo. But there is simply no evidence for this

14    conclusion. Skinnarland made inquiries into Dr. Okembgo's behavior following

15    the allegations of harassing behavior; those inquiries necessarily involved asking

16    other women about their experiences with Dr. Okembgo.

17    Dr. Okembgo also states that Skinnarland created a Chemist 3 position for

18    one of the three candidates who was interviewed at the same time as Dr. Okembgo,

19    Dr. Eberlein. ECF No. 45 at 1. He contends that "Mr. Skinnarland had to hire Dr.

20    Eberlein because he had laid out his plans to get Dr. Okembgo dismissed from

working at Ecology." ECF No. 45 at 2. He goes on to say "it was clearly evident that the position of a Chemist was not needed," citing an email from Alisa Huckaby as proof that Skinnarland intended to replace Dr. Okembgo with Dr. Eberlein.[8] However, the email in question simply notes that Dr. Okembgo's "work deliverables" are those typically assigned to permit writers, and asking for clarification and modification of the workscope associated with Dr. Okembgo, Dr. Eberlein, and another chemist. ECF No. 45 at 67, Exhibit 1. Accordingly, this conclusory allegation is unsupported and insufficient to create a dispute of material fact for the purposes of summary judgment. Likewise, other statements regarding Skinnarland's attempts to sow discord, ask women if they were being harassed, or attack Dr. Okembgo's book are unsupported by any reference to supporting material, such as a declaration. *See* ECF No. 45 at 3.

There is simply no indication that the people who made the decision to discharge Dr. Okembo had any discriminatory motivation for doing so. To the contrary, they were concerned about Dr. Okembgo's repeated sexual harassment

---

[8] Defendant contends in its reply, to which Dr. Okembgo did not have an opportunity to respond, that Dr. Eberlein was hired in July 2009, eight months before any disciplinary action taken against Dr. Okembgo. ECF No. 54 at 4; Skinnarland Declaration at 2.

1  and, to a lesser degree, Dr. Okembgo's misuse of state resources and time for his

2  nonprofit work and promotion of his book—all activities which expressly violated

3  Department policy.

4        For the reasons stated, the Court finds that Defendant provided legitimate

5  and nondiscriminatory reasons for discharging Plaintiff, and Plaintiff failed to

6  show that those reasons were pretext for discriminatory animus. Accordingly, the

7  Court grants Defendant's motion for summary judgment on this issue.

8  **C. Plaintiff's Allegations of First Amendment Violations**

9        Plaintiff contends in his opposition to Defendant's Motion for Summary

10  Judgment that "it is a discrimination for the defendant to make rules that conflict

11  with the Constitutional rights of a citizen" under the First Amendment of the U.S.

12  Constitution. ECF No. 45 at 60. He further argues that the defendant enacted an

13  official policy that interfered with his right to freedom of religion, and appears to

14  argue that restriction on sharing his book impinges on his freedom of speech. *Id*.

15  Plaintiff also cites *United States v. Means*, 627 F. Supp. 247 (D. South Dakota

16  1985), *rev'd in United States v. Means*, 858 F.2d 404 (8th Cir. 1988), for the

17  proposition that it is arbitrary and capricious when a policy denies freedom of

18  religion. *Id*. Plaintiff's complaint includes a request for relief from "Defendant's

19  trumping of [his] protected speech in the work environment." ECF No. 1 at 4.

20  Factual allegations in the complaint relating to speech consist of the following:

[Skinnarland] trampled on my right to freedom of expression by forbidding the sharing of my thoughts during normal conversations with colleagues and forbade giving my book to those who wanted to read it. He gave management a directive that I should not use the word 'pray' when other staffs [sic] were allowed to express their cultural values as they wished.

ECF No. 1 at 3.

### 1. Freedom of Speech

Based on Dr. Okembgo's *pro se* complaint and response to Defendant's motion for summary judgment, the precise grounds under which he claims First Amendment protections are unclear. However, the Court construes *pro se* pleadings and responses liberally, and accordingly examines several possibilities. One basis for protection is that Defendant's memoranda were rules that infringed on his freedom of expression. Another is that he was discharged for exercising his First Amendment rights. The Court considers each in turn.

### a. Whether the Department's Work Expectations Memoranda Violated Dr. Okembgo's First Amendment Rights

Defendant frames the alleged First Amendment violation as a restriction on speech, applying the "public concern" test to measure whether the Department, as a state agency, could impose certain restrictions on Dr. Okembgo.

Government employees do not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of their employment. *Connick v.*

*Myers*, 461 U.S. 138, 142 (1983). But "a governmental employer may impose

certain restraints on the speech of its employees, restraints that would be

unconstitutional if applied to the general public." *City of San Diego, Cal. v. Roe*,

543 U.S. 77, 80, 82 (2004). When an employee speaks as a "citizen on matters of

public concern" rather than as an "employee upon matters only of personal

interest," the Court will apply a balancing test.  *Id*. at 83 (citing *Connick v. Myers*,

461 U.S. 138, 143 (1983)). "Whether an employee's speech addresses a matter of

public concern must be determined by the content, form, and context of a given

statement, as revealed by the whole record." *Id*. If the speech in question is a

matter of public concern, the Court applies the *Pickering* balancing test, which

evaluates "restraints on a public employee's speech to balance 'the interests of the

[employee], as a citizen, in commenting upon matters of public concern and the

interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'" *Id*. (quoting *Pickering* v. *Board of*

*Education of Township High School District 205 Will Cnty., Ill.,* 391 U.S. 563, 568

(1968).

　　　The January 27, 2010, Work Expectation memorandum's provisions

pertaining to free speech provide:

> 4) You are not to use your work time for any non-work activity including:
> - Promoting and soliciting contributions of money, time or other donations for your non-profit organization or other non-work related activities that you are involved in

- Promoting, selling and/or distributing your book on marriage
- Promoting religious opinions, providing religious information, counseling, offers to pray

5) You are not to use your assigned state computer, work phone, copy machine, fax machine or any other state equipment for any non-work related activity.

ECF No. 32-5 at 2, Exhibit N. The April 7, 2010, memorandum contains the same provisions. The memoranda, therefore, prohibit three specific expressive acts during work time: (1) promoting or soliciting for outside activities, including a nonprofit organization; (2) promoting, selling or distributing a book; and (3) promoting religion and religious beliefs and offering to pray.

Defendant contends that Dr. Okembgo's speech was not on a matter of public concern because it pertained to a subject of personal interest. ECF No. 54 at 8-9. While this is a close question, Plaintiff's speech—promotion of the nonprofit organization, his book, and his religion during work hours—constitutes a matter of public concern, contrary to Defendant's argument. "This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace." *Tucker v. State of Cal. Dep't of Educ.,* 97 F.3d 1204, 1210 (9th Cir. 1996); *see also Gillette v. Delmore,* 886 F.2d 1194, 1197 (9th Cir. 1989) ("Speech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected."); *National Treasury Employees Union v. United States,* 990 F.2d 1271 (D.C.Cir. 1993), *aff'd in relevant part, rev'd in part*

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 31

*on other grounds,* 513 U.S. 454 (1995) ("The contrast, [between public concern speech and non-public concern speech], then was between issues of external interest as opposed to ones of internal office management. Accordingly, we read the "public concern" criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche."). Here, under this broad standard and in the light most favorable to Plaintiff, all three types of speech arguably concern social matters or matters possibly of concern to the community, not "internal power struggles within the workplace." Insofar as selling his book or asking for donations may be unprotected, the underlying speech about the cause the nonprofit organization stands for, Plaintiff's religious beliefs, and the subject matter of the book are arguably matters of public concern; at minimum, they are not matters of internal grievances. Thus, taken in the light most favorable to Plaintiff and under the Ninth Circuit's broad standard, all three types of speech are protected by the First Amendment, and the Court moves to the next question in the analytical framework.

Even where a public employee's speech implicates a genuine matter of public concern, a public employer may still be justified in firing the employee. *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999). In determining a public employee's rights to free speech, courts must strike a balance "between the

1    interests of the [employee], as a citizen, in commenting upon matters of public

2    concern and the interest of the State, as an employer, in promoting the efficiency of

3    the public services it performs through its employees." *Pickering,* 391 U.S. at 568.

4    "When someone who is paid a salary so that [he] will contribute to an agency's

5    effective operation begins to do or say things that detract from the agency's

6    effective operation, the government employer must have some power to restrain

7    [him]." *Waters v. Churchill*, 511 U.S. 661, 675 (1994). The employer's interest

8    outweighs the employee's interest in speaking on a matter of public concern if the

9    employee's speech "impairs discipline by superiors or harmony among co-workers,

10    has a detrimental impact on close working relationships for which personal loyalty

11    and confidence are necessary, or impedes the performance of the speaker's duties

12    or interferes with the regular operation of the enterprise." *Rankin v. McPherson,*

13    483 U.S. 378, 388 (1987). In balancing these interests, a court must consider "the

14    manner, time, and place of the employee's expression." *Id.*

15        Here, the memoranda prohibit three types of speech during work hours.

16    First, the memoranda prohibit "Promoting, selling and/or distributing your book on

17    marriage"—language suggesting that the Department was restricting commercial

18    activities related to the book. Defendant has a much greater interest in preventing

19    an employee from spending work time and state resources on selling a book than

20    the Plaintiff has in using those hours to sell the book, especially when there were

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 33

no restrictions on him doing so outside of work hours. Furthermore, the

Department, as a state agency, has an interest in maintaining the appearance of

independence from religion. Insofar as the book contained themes on Christianity

and marriage, as the evidence suggests, the Court notes that the Department has a

strong interest in maintaining the appearance of neutrality with respect to religion.

With respect to the Department's prohibition on "Promoting and soliciting

contributions of money, time or other donations for your non-profit organization or

other non-work related activities that you are involved in," the Court likewise finds

that the Department's interest in restricting these activities during work hours and

using work resources outweighs Plaintiff's interest. This is particularly so in the

context of the evidence that Dr. Okembgo had gone to the WSU library during

work hours to work with the students from his nonprofit organization, and that he

was receiving non-work emails regarding the nonprofit organization at his work

email address. The Department paid him to perform a public service as a chemist,

not to work on personal projects, however worthwhile and important. While Dr.

Okembgo disputes the extent of his email use, he does not dispute that there may

have been some use, and he does not appear to dispute that he spent time on his

nonprofit organization during work hours. As such, the Department's interest in

restricting activities that impede the employee's productivity weighs heavy in the

balance.

With respect to the last type of speech restricted under the memoranda, "Promoting religious opinions, providing religious information, counseling, offers to pray," the Court again finds that the Department's interest in promoting "harmony among co-workers" and limiting impediments to "the performance of the speaker's duties" and "the regular operation of the enterprise" outweigh the Plaintiff's interest. This is especially so given the context of the restrictions; this particular restriction arose after a co-worker complained of being "pulled" into a conference room to pray after a miscarriage, and another complained that Plaintiff had repeatedly offered to pray for her fertility. The prayers, proffered religious information, and offers of counseling were intertwined with the topics of conversation Dr. Okembgo's co-workers found uncomfortable discussing with him: pregnancy and fertility. Furthermore, since the restriction was only on this activity during work, the Department may have been concerned about Dr. Okembgo's use of work public space, such as the conference room, for these impromptu prayers. Again, the Department's interest in maintaining neutrality with respect to religion is one more factor weighing in its favor.

Accordingly, the Court finds that the Department's interest in maintaining a workplace that is free of sexual harassment, does not promote a particular religion, and which maintains some semblance of order and efficiency outweighs the

Plaintiff's interest in selling his book, promoting his religious beliefs, or running his nonprofit organization, while he is supposed to be working.

### a. Whether Dr. Okembgo Was Discharged in Retaliation for Exercising Protected First Amendment Rights

In a closely related argument, Dr. Okembgo also may be claiming that he was terminated for exercising his First Amendment rights.

"When a government employee exercises his protected right of free expression, the government cannot use the employment relationship as a means to retaliate for that expression." *Coszalter v. City of Salem*, 320 F.3d 968, 973-74 (9th Cir. 2003). In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action"; and (3) that his or her speech was a "substantial or motivating" factor for the adverse employment action. *Coszalter*, 320 F.3d at 973-74 (citing *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 675 (1996); *Nunez,* 147 F.3d at 874-75; *Hyland v. Wonder,* 972 F.2d 1129, 1135-36 (9th Cir. 1992); *Allen v. Scribner,* 812 F.2d 426, 430-36 (9th Cir. 1987)).

The first question is whether Dr. Okembgo engaged in protected speech. To be protected, as noted above, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 36

by any injury the speech could cause to "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters*, 511 U.S. at 668 (quoting *Connick,* 461 U.S. at 142; *Pickering,* 391 U.S. at 568).

Plaintiff does not clearly indicate what speech might be protected. The complaint states that Defendant had forbidden him from sharing his "thoughts" during "normal conversations" with co-workers; from giving his book to people who wanted to read it; and from using the word "pray." ECF No. 1 at 3. Presumably at least some of the speech implicated by the Work Expectations Memoranda is included in this description, such as discussions of religion, trying to distribute his book, and solicitations for his nonprofit organization. However, as noted above, the Department's interest in maintaining an efficient and harassment-free workplace outweigh whatever interest Plaintiff may have in carrying out those activities during work hours.[9] Insofar as there might be other protected speech at

_____

[9] For example, the Supreme Court has indicated that Title VII's prohibition on discrimination in the "terms, conditions, or privileges of employment" includes the requirement that employers maintain a workplace where employees are free from harassment based upon a protected status. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65-66 (1986).

issue, the Court notes that it is ultimately immaterial because here, as discussed in the Title VII context, the undisputed evidence overwhelmingly points toward the repeated sexual harassment complaints against Dr. Okembgo as the motivating factor in his termination—not retaliation for any form of protected speech. His female co-workers made claims that he stood too close, made suggestive comments, discussed pregnancy and fertility, hugged and touched them and otherwise made them uncomfortable in violation of the Department's sexual harassment policy. In fact, the most extensive of these complaints took place after Dr. Okembgo was first investigated for and warned about violation of the sexual harassment policy. Furthermore, an investigation revealed evidence that Dr. Okembgo was using work time for his nonprofit organization.

Accordingly, Plaintiff's suggestion that he was terminated in retaliation for protected speech fails.

### 2.  Freedom of Religion

The Court next turns to Plaintiff's allegations that the Department "enacted an official policy that interfered with plaintiff's right to freedom of religion." ECF No. 45 at 60. The Court first notes that this claim, raised in Plaintiff's responsive memorandum, is only obliquely referenced in the complaint, and Defendant did not address it in its reply. Plaintiff cites *U.S. v. Means*, 627 F. Supp. 247 (1985), *rev'd*

1  *in U.S. v. Means*, 858 F.2d 404 (8th Cir. 1988), for the proposition that it is

2  arbitrary and capricious when a policy denies freedom of religion. *Id.*

3        Plaintiff has failed to establish that his right freely to exercise his religion

4  was substantially burdened by the government's action in this case. *Vernon v. City*

5  *of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir. 1994) ([t]o show a free exercise

6  violation, the religious adherent . . . has the obligation to prove that a governmental

7  [action] burdens the adherent's practice of his or her religion by pressuring him or

8  her to commit an act forbidden by the religion or by preventing him or her from

9  engaging in conduct or having a religious experience which the faith mandates.

10  This interference must be more than an inconvenience; the burden must be

11  substantial and an interference with a tenet or belief that is central to religious

12  doctrine.) (citation omitted).

13        Insofar as Plaintiff claims relief under the Administrative Procedure Act ,

14  the Court notes that the Federal Administrative Procedure Act governs federal

15  agencies. Washington State Agencies, like the Washington State Department of

16  Ecology, are governed by the Washington Administrative Procedure Act, codified

17  at RCW 34.05. Having dismissed Plaintiff's federal discrimination and

18  constitutional claims above, the Court declines to exercise supplemental

19  jurisdiction over any possible pendent state law claims.

20

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 39

Because the parties do not brief or discuss any possible additional infringement of Dr. Okembgo's right to free exercise of religion on other theories, nor does Plaintiff make such claim in his Complaint, the Court will not further consider such an argument here.

**D. Plaintiff's Further Allegations that Defendant Failed to Follow its Policies**

Plaintiff again invokes the Administrative Procedure Act in his opposition to Defendant's Motion for Summary Judgment when he claims that it is a violation of the APA when an agency fails to follow its own policy. ECF No. 45 at 60. As noted above, the Court again declines to exercise any supplemental jurisdiction over possible pendent state law claims arising out of violations of state administrative procedure rules.

**E. Plaintiff's Motion for Summary Judgment**

Plaintiff, appearing *pro se*, filed a motion for summary judgment (ECF No. 50) on January 17, 2014, 39 days after the deadline for dispositive motions established in the Jury Trial Scheduling Order (ECF No. 22).  Plaintiff has not filed any motion to extend the deadline for dispositive motions or indicated any good cause for the delay. Defendant objects to Plaintiff's motion as untimely and notes that it merely presents arguments made in Plaintiff's response to Defendant's motion for summary judgment. ECF No. 68. Regardless, because the Court grants

Defendant's motion for summary judgment on all claims, Plaintiff's untimely motion is moot.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 24) is **GRANTED**.

2. Plaintiff's untimely Motion for Summary Judgment (ECF No. 50) is **DENIED** as moot.

3. All other pending motions are **DENIED** as moot.

4. All pending hearings and the jury trial are **VACATED**.

The District Court Executive is hereby directed to enter this Order, provide copies to counsel and Plaintiff at his address of record, enter judgment in favor of Defendant Department of Ecology, and **CLOSE** the file.

**DATED** February 24, 2014.

THOMAS O. RICE
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 41